IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

James Stephen McCune,

      Plaintiff,

      v.                       Case No. 2:14-cv-25

Virginia Workman,          CHIEF JUDGE EDMUND A. SARGUS, JR.
                             Magistrate Judge Kemp

      Defendant.

## REPORT AND RECOMMENDATION

Plaintiff James Stephen McCune, an inmate at the Madison Correctional Institution ("MaCI"), filed this action alleging violations of his constitutional rights, as well violation of his rights under the Americans With Disabilities Act of 1990 ("ADA"). Defendant Virginia Workman has moved for summary judgment, and the motion is now ripe for consideration. (Doc. 22). For the reasons set out below, it will be recommended that the motion for summary judgment be granted as to Mr. McCune's claims under 42 U.S.C.A. §1983 and denied as to his claims under the ADA.

### I.  Summary of Claims

Mr. McCune is blind. He is classified as security Level 1, which is minimum security status at MaCI. Ms. Workman is the Unit Management Chief in charge of Mr. McCune's unit at MaCI. In about March, 2013, Mr. McCune filed an internal grievance with the institution complaining that he was being housed in Zone A, which housed higher security status Level 2 inmates. He requested to be moved to Zone B with the other Level 1 inmates, where he asserts that there are additional rights and privileges provided to inmates. It is not clear from the record exactly what rights and privileges are provided to inmates in Zone B that are not provided in Zone A, but most inmates housed in Zone A are

Level 2 inmates.  Mr. MCune was ultimately successful in his
internal grievance and in May of 2013, he was granted a transfer
to Zone B.  However, he was told by Ms. Workman that the transfer
was conditional on him signing the following "Understanding of
Transfer", which she drafted:

> "I, Inmate McCune A-302339, am requesting to
> transfer to Madison Correctional Zone B.  I
> am a level 1B offender and wish to have full
> access to the privileges that are offered as
> a level 1B offender.  However, due to being
> vision impaired I have remained in Zone A of
> Madison Correctional.  I am now requesting to
> transfer to Zone B with full understanding
> that I am voluntarily resigning from the
> vision impaired program that is offered at
> MaCI [which operates in Zone A, not Zone B].
> By resigning and transferring to Zone B I
> understand that I will not have access to the
> Braille Room and the equipment that is
> provided inside.  I will not have access to a
> Braille typewriter, I have full understanding
> that these items will not be provided to me
> on Zone B of the prison.  I will no longer
> receive any of the items that are purchased
> by the department for the sole purpose of the
> vision impaired program.  The only privilege
> I will receive in Zone B is an assigned Blind
> Aid by the department.  I am also allowed to
> have Hadley School for the Blind send in
> classroom material that is approved by the
> ODRC."  (Doc. 26-1 at 166-167).

The sight impaired program ("Program") at MaCI is a grant
funded program and is maintained only in Zone A of the
institution, where inmates qualified for the Program are
typically housed, irrespective of security status.  (Doc. 22-1 at
¶ 5).  Inmates in the Program are provided with access to a room
which contains braille equipment, large print and audio books, a
computer and other materials to assist those with sight
impairment.  According to Mr. McCune, Ms. Workman told him that
if he could find a charity or other organization that was willing

to provide him with a braille typewriter, commonly referred to as a "brailler," and braille paper that he would be permitted to receive it in Zone B.  (Doc. 4 at 5).  Ms. Workman denies this, maintaining that she "did not tell Inmate McCune that he could attempt to secure a Brailler or Braille paper from an outside entity or agency as part of his transfer to Zone B." (Doc. 22-1 at 3).  Mr. McCune was seeking access to the braille equipment in order for him to participate in correspondence courses through the Hadley School for the Blind and a Bible school, to prepare for his braille certification through the Federation for the Blind, and to correspond with a friend who also uses braille. (Doc. 26-1 at 167).

Mr. McCune contends that once he arrived in Zone B in the middle of May 2013 he was informed by his case manager that, per Ms. Workman's instructions, he was not permitted to touch any of the braillers that were located in Zone B and that if he was caught doing so he would be placed in segregation and have his security status raised.  (Doc. 4 at 6).  Mr. McCune proceeded to contact a number of organizations and charities who provide services for the sight impaired, but was unsuccessful in obtaining donated equipment.  Several of these agencies contacted Ms. Workman to inquire as to MaCI's policy for accommodation of sight impaired inmates, including Disability Rights Ohio ("DRO"). According to an attorney with DRO who was liaising with Ms. Workman on Mr. McCune's behalf, he found it "very difficult to work with Ms. Workman; she frequently delays, makes empty promises, tells me information that is not accurate, and is making this project slow." (Doc. 26-1 at 431).  The attorney from DRO was attempting to assist Mr. McCune and other sight impaired inmates at MaCI to obtain access to braille equipment and a computer, and for MaCI to create written and publicly posted policies on the use of the braille room.  Id. at 425-426.

3

Mr. McCune states that on October 23, 2013 he was called into his case manager's office and informed that Ms. Workman had relayed the message that she was "fed up" with his letter writing and complaining about not having braille equipment and if he "continue[d] to try and obtain any of these items then she will have [his] ass sent back to the Medium side Level 2 so fast [his] head would spin." The next day Mr. McCune was called back to his case manager's office and asked whether he still needed the equipment, and he confirmed that he did. (Doc. 4 at 5). On October 30, 2013, although he remained a security Level 1 inmate, Mr. McCune was transferred back to Zone A. He claims that this was initiated by Ms. Workman in retaliation for writing to the various blind organizations, and otherwise seeking access to braille equipment in Zone B. The parties agree that during his five months in Zone B, Mr. McCune had no rule infractions. Mr. McCune states that although three braillers were available in Zone B, Ms. Workman did not permit him to use them. He argues that he should have been provided access to a brailler and braille paper in Zone B, the equivalent of access to a typewriter and paper, which are provided to sighted inmates in both Zones A and B.

According to Mr. McCune, he was further retaliated against by Ms. Workman by being intentionally re-housed in Zone B with a Level 2 inmate whom she knew to be prone to violence. Mr. McCune states that this inmate harassed him, urinated in his coffee jar, poured out his toiletries, threatened to kill him, and physically assaulted him. Subsequently, he filed a grievance seeking to have that cell mate replaced by one of a couple of specifically named blind aid inmates. (Doc. 4 at 6). Mr. McCune was assigned a new cell mate within two days of his grievance, although not either of the specific inmates he named in the grievance.

4

Ms. Workman agrees that Mr. McCune's housing moves between Zones A and B were timed as he reports, but maintains that in both zones he was provided with all privileges afforded to him as a security Level 1 inmate.  (Doc. 12 at 3).  She states that it was Mr. McCune's wish to be transferred to Zone B in May of 2013, and he agreed to the transfer with the knowledge and understanding that he would not have access to the Program, braille equipment and other aids for the sight impaired that were available in Zone A.  She asserts that Mr. McCune's relocation in October, 2013, back to Zone A from Zone B was neither a punishment nor discrimination against him, but was to enable him to re-enroll in the Program and access the braille equipment he was seeking.  (Doc. 22-1 at 3).  Ms. Workman further points out that Mr. McCune's initial cell mate assignment upon his transfer back to Zone A in October of 2013 was acceptable, as the policy of the Ohio Department of Rehabilitation and Correction permits security Level 1 and Level 2 inmates to be housed in the same cell.  (Doc. 22 at 6).  Subsequent to the filing of this lawsuit, in March of 2015, Mr. McCune was transferred back to Zone B, and now has access to braille equipment in that section, as well as other accommodations for his disability.  (Doc. 22-1 at 4).

Mr. McCune's complaint seeks relief in the form of access to braille equipment in Zone B of the prison, which it appears is now the case.  He also seeks compensation for his pain and suffering, as well as mental and emotional distress, the retaliatory treatment by Ms. Workman, and injuries sustained by him at the hands of the cell mate in Zone A.  (Doc. 4 at 6)

## II.  Legal Standard

Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute.  It may be rendered only when appropriate evidentiary materials, as described in Fed. R. Civ. P. 56(c), demonstrate the

absence of a material factual dispute and the moving party is
entitled to judgment as a matter of law.  Poller v. Columbia
Broad. Sys., Inc., 368 U.S. 464 (1962).  The moving party bears
the burden of demonstrating that no material facts are in
dispute, and the evidence submitted must be viewed in the light
most favorable to the nonmoving party.  Adickes v. S.H. Kress &
Co., 398 U.S. 144 (1970).  "[I]f the evidence is insufficient to
reasonably support a jury verdict in favor of the nonmoving
party, the motion for summary judgment will be granted."  Cox v.
Kentucky Dept. of Transp., 53 F.3d 146, 150 (6th Cir. 1995)
(citation omitted).  Additionally, the Court must draw all
reasonable inferences from that evidence in favor of the
nonmoving party.  United States v. Diebold, Inc., 369 U.S. 654
(1962).  The nonmoving party does have the burden, however, after
completion of sufficient discovery, to submit evidence in support
of any material element of a claim or defense on which that party
would bear the burden of proof at trial, even if the moving party
has not submitted evidence to negate the existence of that
material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317
(1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  Of
course, since "a party seeking summary judgment ... bears the
initial responsibility of informing the district court of the
basis for its motion, and identifying those portions of [the
record] which it believes demonstrate the absence of a genuine
issue of material fact," Celotex, 477 U.S. at 323, the responding
party is only required to respond to those issues clearly
identified by the moving party as being subject to the motion.
It is with these standards in mind that the instant motions must
be decided.

    III.  Defendant's Motion for Summary Judgment

  Ms. Workman raises three legal arguments in support of her
motion for summary judgment: (1) any claims made against her in

her individual capacity fail because Mr. McCune cannot establish
any constitutional or ADA violations; (2) any claims made against
her in her official capacity are barred by the Eleventh
Amendment; and (3) she is entitled to qualified immunity.  These
arguments will be addressed in turn below.

A.  <u>Americans With Disabilities Act</u>

Title II of the ADA prohibits a public entity, including
state prisons, from discriminating against a qualified individual
with a disability on account of that individual's disability.  42
U.S.C. §12131 <u>et seq</u>; <u>Pennsylvania Dept. of Corrections v.
Yeskey</u>, 524 U.S. 206 (1998).  To establish a violation of Title
II of the ADA, a plaintiff must allege and show that (1) he has a
disability; (2) he is otherwise qualified to receive the benefit
or service at issue; and (3) he is being excluded from
participation in, being denied the benefit of, or being subjected
to discrimination in the provision of the services, programs, or
activities of the public entity because of his disability.  <u>42
U.S.C.A. §12131(1)</u>.  State prisons are public entities for the
purposes of the ADA.  <u>Yeskey</u>, at 210.

In the case of sight impaired prisoners, inmates should be
provided with auxiliary aids and services such as "qualified
readers, taped texts, audio recordings, Brailled materials, large
print materials, or other effective methods of making visually
delivered materials available to individuals with visual
impairments." <u>Mason v. Correctional Medical Services, Inc.</u>, 559
F.3d 880, 886 (8th Cir. 2009), <u>citing</u> 28 C.F.R. §35.104(2).  For
a plaintiff to state an ADA claim, he must allege that he has
been excluded from participating in or denied the benefits,
services, programs or activities available to other inmates.
<u>Meade v. Michigan Dept. of Corrections</u>, 2013 WL 890240 (W.D.
Mich. 2013).  In <u>Meade</u>, the court considered whether the prison
violated the ADA by failing to provide a blind inmate with

7

braille equipment or some type of audio format to review documents prepared for his legal matters. The court, denying defendants' motion to dismiss, concluded that the plaintiff had a plausible ADA claim by alleging that he was denied equivalent benefits available to other inmates at the institution, including the ability to use a legal writer or braille translations. Id.

Mr. McCune alleges that he was not provided with a brailler while housed in Zone B at MaCI, although sighted inmates were provided with typewriters. As a condition of approving his transfer to Zone B, Mr. McCune was required to essentially lose all access to braillers. Curiously, there is evidence on the record that braillers were available in Zone B, but the parties agree that Mr. McCune was not permitted to use them. Ms. Workman also denies telling Mr. McCune that he could receive a brailler in Zone B if he obtained a donated one from an outside organization. Ms. Workman does not provide any specific reasons as to her position in respect of braillers in Zone B, such as being subject to undue hardship or an administrative or security concern. Instead, she relies on Mr. McCune's agreement to forego access to braillers in the Letter of Understanding as a condition to his transfer to Zone B. Mr. McCune asserts there were a number of rights and privileges afforded to inmates housed in Zone B that were not available in Zone A, but he does not provide specifics as to these privileges. Ms. Workman maintains that Mr. McCune was afforded the same rights and privileges in Zone A as other Level 1 inmates, but also does not provide specific examples. It is unclear from the record whether other reasonable accommodations were made for Mr. McCune during the time that he was not allowed access to braille equipment.

As the Court is obligated to analyze the facts available in the light most favorable to the plaintiff, there is a genuine issue of material fact as to whether Mr. McCune could

successfully pursue an ADA claim based on unequal treatment.  For
this reason, the Court will recommend denying Ms. Workman's
motion for summary judgment as to the ADA claim.

## B.  Section 1983 Claims

Title 42, §1983 of the United States Code provides a
mechanism for seeking redress for an alleged deprivation of a
litigant's federal constitutional rights.  To establish a prima
facie claim under §1983, a plaintiff must satisfy two elements:
(1) that defendants acted under color of state law, and (2) that
defendants deprived plaintiff of a federal statutory or
constitutional right.  See, e.g., Flagg Bros. v. Brooks, 436 U.S.
149, 155 (1978); Searcy v. City of Dayton, 38 F.3d 282, 286 (6th
Cir. 1994); United of Omaha Life Ins. Co. v. Solomon, 960 F.2d
31, 33 (6th Cir. 1992) (per curiam).  Conclusory allegations are
insufficient to state a claim under §1983.  Rhodes v. Chapman,
452 U.S. 337 (1981).

Mr. McCune's complaint alleges that his constitutional
rights were violated by Ms. Workman's failure to arrange
accommodation for  his sight impairment, as well as for
retaliating against him for exercising his rights to file
internal grievances with the institution.  "[T]he treatment a
prisoner receives in prison and the conditions under which he is
confined are subject to scrutiny under the Eighth Amendment."
Helling v. McKinney, 509 U.S. 25, 31 (1993).  Prison officials
have a duty to protect prisoners from violence at the hand of
other prisoners.  Farmer v. Brennan, 114 S.Ct. 1970, 1976 (1994).
However, every injury suffered by an inmate at the hands of
another does not amount to a violation of the assaulted inmate's
constitutional rights.  The deprivation alleged must be
sufficiently serious, Wilson v. Seiter, 111 S.Ct. 2321, 2324
(1991), and the inmate must show that he is incarcerated under
conditions which pose a substantial risk of serious harm.  In

9

order to impose individual liability on a prison official, the inmate must show that the official was deliberately indifferent to a substantial risk of serious harm to an inmate.  Helling v. McKinney, 113 S.Ct 2475, 2481 (1993).  There must be a showing that the prison official was more than merely negligent, and "must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference."  Harrison v. Ash, 539 F.3d 510, 518 (6th Cir. 2008).

Mr. McCune contends that Ms. Workman knew that the inmate with whom he was placed when he was transferred back to Zone A was prone to violence, and she failed to take measures to protect his safety.  However, Mr. McCune is unable to provide evidence that Ms. Workman had knowledge of the violent nature of this inmate or deliberately placed him into the cell with the other inmate knowing that his safety was at risk.  In fact, when Mr. McCune filed a grievance about the problems he was having with that inmate Ms. Workman promptly arranged for him to be rehoused with another inmate.  Mr. McCune was not housed with one of the specific inmates that he requested, but it is well established that an inmate does not have a constitutional right to choose a particular cell mate, and that prison officials retain broad discretion over "housing in general and cell assignments in particular".  Quick v. Mann, 170 Fed.Appx. 588, 590 (10th Cir. 2006).  Thus, the evidence provided by Mr. McCune fails to establish that Ms. Workman's actions violated his Eighth Amendment rights.

Retaliation for the exercise of constitutional rights is itself a violation of the First Amendment.  To state a retaliation claim, a plaintiff must allege three elements: (1) that he or she was engaged in protected conduct; (2) an adverse action was taken against him or her that would deter a person of

10

ordinary firmness from continuing to engage in that conduct; and
(3) the adverse action was motivated at least in part by the
plaintiff's protected conduct. Thaddeus-X v. Blatter, 175 F.3d
378, 394 (6th Cir.). Retaliation claims must include a
"chronology of events from which retaliation may plausibly be
inferred." Ishaaq v. Compton, 900 F.Supp. 935 (W.D. Tenn. 1995)
(quoting Cain v. Lane, 857 F.2d 1139, 1143 n. 6 (7th Cir. 1988)).
The retaliatory filing of a disciplinary charge or other negative
actions strike at the heart of an inmate's constitutional right
to seek redress of grievances, so the injury to this right
inheres in the retaliatory conduct itself. Id. "An inmate has
an undisputed First Amendment right to file grievances against
prison officials on his own behalf." Herron v. Harrison, 203
F.3d 410, 415 (6th Cir. 2000).

Mr. McCune also claims that Ms. Workman retaliated against
him for exercising his right to file grievances and to seek
assistance from outside organizations for his sight impairment,
both by transferring him to Zone A and by housing him with the
inmate who assaulted him. Ms. Workman argues that Mr. McCune was
not retaliated against, but was moved back to Zone A so that he
could access a brailler and re-join the Program. There is no
dispute that Mr. McCune's security status remained Level 1 at all
relevant times. Ms. Workman states that he was afforded all
rights and privileges that other Level 1 inmates are provided.
Mr. McCune disputes this, but does not provide specific examples
of the rights he had in Zone B as compared to Zone A, other than
the fact that he was not permitted access to a brailler in Zone
B.

The facts in this case establish that Mr. McCune did engage
in the protected conduct of filing institutional grievances and
seeking accommodation for his vision impairment. It must next be
determined whether Ms. Workman's actions would deter a person of

11

ordinary firmness from continuing to engage in that conduct and
whether her actions were motivated at least in part by Mr.
McCune's engagement in that protected conduct.  As discussed
above, despite Mr. McCune's conclusory statement that he was
denied certain rights and privileges by being transferred to Zone
A, the transfer actually resulted in him having access to the
braillers that he was seeking.  His security status remained
Level 1, and he does not provide any specific information on what
rights and privileges he was denied by being housed in Zone A.
Moreover, the Court fails to see a causal link between the
exercise of his rights and his assignment to a cell mate who
turned out to be violent.  When he filed a grievance because of
the problems he was having with the cell mate it was promptly
resolved.  Mr. McCune does not allege that he was not reasonably
accommodated at all for his disability, but that he was not
accommodated in accordance with his specific request for access
to a brailler.  Even accepting Mr. McCune's version of the
events, Ms. Workman's actions did not rise to the level of a
Constitutional violation.  Thus, the Court recommends granting
summary judgment in favor of Ms. Workman regarding Mr. McCune's
§1983 claims.

C. <u>Eleventh Amendment Immunity</u>

Mr. McCune does not specify in his complaint whether he is
suing Ms. Workman in her official or individual capacity.  To the
extent that she is being sued in her official capacity, Ms.
Workman argues that all of Mr. McCune's claims are barred by
Eleventh Amendment Immunity. (Doc. 22 at 4-5).  The Eleventh
Amendment bars a suit brought in federal court against a state
and its agencies unless the state has waived its sovereign
immunity or otherwise consented to be sued.  <u>Pennhurst State Sch.</u>
<u>& Hosp. V. Halderman</u>, 104 S.Ct. 900, 908 (1984).  It is well
settled that the State of Ohio has not waived its immunity for

money damages, except to the extent that such claims are allowed to be brought in the Court of Claims of Ohio. Lee Testing & Engineering, Inc. v. Ohio Dept. of Transp., 855 F.Supp.2d 722 (S.D. Ohio 2012). Notwithstanding, in some circumstances Congress may abrogate sovereign immunity by enacting appropriate legislation. Virginia Office for Protection and Advocacy v. Stewart, 131 S.Ct. 1632, 1638 (2011).

Ms. Workman is correct that government officials sued in their official capacities pursuant to §1983 are entitled to Eleventh Amendment sovereign immunity. Will v. Michigan Dept. of State Police, 109 S.Ct. 2304 (1989). However, it is necessary to distinguish between the §1983 claim alleging violation of constitutional rights and the ADA claim brought by Mr. McCune. Title II of the ADA does not provide for lawsuits against a public official acting in his or her individual capacity. "[T]he proper defendant under a Title II claim is the public entity or an official acting in his official capacity." Id. In the present case, Mr. McCune's ADA claim against Ms. Workman in her official capacity is actually against the State of Ohio as the real party in interest. See Mingus v. Butler, 591 F.3d 454, 482 (6th Cir. 2010).

The power of Congress under Section 5 of the Fourteenth Amendment to enforce its provisions includes the power to abrogate state sovereign immunity by authorizing private lawsuits for damages against the states for violations of that Amendment. United States v. Georgia, 126 S.Ct. 877, 882 (2006). The Supreme Court has held that Title II of the ADA validly abrogates state sovereign immunity and permits a private cause of action for damages against a state for conduct that violates the Fourteenth Amendment. Id. The Georgia court further clarified that a flexible standard should be applied to determine whether an ADA plaintiff can overcome a defendant's defense of Eleventh

Amendment immunity.  This should be determined on a "claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) <u>insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid</u>." (Emphasis added).  <u>Id</u>. at 883.  The Sixth Circuit considers this test to be required when analyzing whether a State has sovereign immunity in Title II cases.  <u>Mingus v. Butler</u>, 591 F.3d 474, 482 (6th Cir. 2010).

In simple terms, Mr. McCune's ADA claim arises from his allegation that Ms. Workman's conduct was discriminatory towards him on the basis of his disability.  Construing the record in the light most favorable to Mr. McCune, he was housed in Zone A, designated for higher security level inmates which offered fewer rights and privileges on the sole basis of his sight impairment. When he sought to be re-housed in Zone B, he was only allowed to do so if he agreed to give up his access to a brailler.  However, all sighted inmates in either zone were permitted access to paper and a typewriter.  According to Mr. McCune, despite the availability of braillers in Zone B he was denied access to them. Ms. Workman denies telling Mr. McCune that he could seek a donated brailler from an outside entity, and Mr. McCune claims that when he did so he was retaliated against by being moved back to Zone A and housed with a violent cell mate.  These allegations, if true, could form a valid Title II claim under the ADA, so Mr. McCune's claim passes the first prong of the <u>Georgia</u> test.  In respect of the second prong of the <u>Georgia</u> test, the Court has already recommended summary judgment in favor of Ms. Workman on the constitutional claims.  Thus, the Court must consider for this particular case whether Congress's purported

14

abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

Because the disabled are not a suspect class for equal protection purposes, a plaintiff must identify a due process or rational-basis type equal protection violation to satisfy this prong of the <u>Georgia</u> test.  <u>See</u> <u>Babcock v. Michigan</u>, 2014 WL 2440065 (E.D. Mich. 2014) <u>citing Popovich v. Cuyahoga Cnty. Court of Common Pleas</u>, 276 F.3d 808, 811 (6th Cir. 2002).  In the present case, the parties agree that Mr. McCune was denied access to a brailler during his entire time while housed in Zone B, and that his transfer to Zone B was conditional upon him agreeing to forego his access to a brailler.  The parties also agree that his access to braillers was denied as a direct result of Ms. Workman's instruction.  There is a question of fact as to whether Level 1 inmates were provided the same rights and privileges as other Level 1 inmates while housed in Zone A, where most inmates were classified as Level 2.  While it appears that Mr. McCune now has access to braillers in Zone B, there was a period of time where he was essentially forced to choose between access to braillers or being housed in a higher security section of the prison.  Viewing these facts in the light most favorable to Mr. McCune, this would be the type of equal protection claim that Congress intended to be actionable under Title II against the State of Ohio.

For these reasons, the Court will recommend granting judgment as a matter of law in favor of Ms. Workman on the §1983 claim brought against her in her official capacity on the basis of Eleventh Amendment immunity.  The Court will recommend that Ms. Workman's motion for summary judgment be denied as to the ADA claim.

D.  <u>Qualified Immunity</u>

Because the Court recommends granting judgment as a matter of law in respect of Mr. McCune's §1983 claims, and because qualified immunity is not applicable to his ADA claims, it is not necessary for the Court to analyze Ms. Workman's affirmative defense of qualified immunity.

## IV.  <u>Recommendation</u>

For the reasons set out above, the Court recommends that the motion for summary judgment (Doc. 22) be granted in part and denied in part.  It is recommended that the motion be granted as to Plaintiff's §1983 claims against Ms. Workman and denied as to Plaintiff's claim under the Americans  With Disabilities Act.

## <u>PROCEDURE ON OBJECTIONS</u>

If any party objects to this <u>Report and Recommendation</u>, that party may, within fourteen days of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the <u>Report and Recommendation</u> will result in a waiver of the right to have the district judge review the <u>Report and Recommendation</u> <u>de novo</u>, an  also operates as a waiver of the right to appeal the decision of the District Court adopting the <u>Report and Recommendation</u>.  <u>See</u> <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge

17